## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| COMMUNITY BROADCASTING | ) | |
| SERVICE, d/b/a WABI-TV, CHANNEL 5, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | Civil No. 07-139-B-W |
| | ) | |
| TIME WARNER CABLE, LLC, | ) | |
| | ) | |
| *Defendant* | ) | |

## MEMORANDUM DECISION ON MOTION TO STRIKE
### AND RECOMMENDED DECISION ON
### MOTION FOR SUMMARY JUDGMENT

In this copyright-infringement suit, defendant Time Warner Cable, LLC ("TWC") moves for summary judgment as to all claims against it by the plaintiff Community Broadcasting Service, d/b/a WABI-TV, Channel 5 ("WABI"). *See generally* Defendant Time Warner NY Cable LLC's Motion for Summary Judgment ("Defendant's Motion") (Docket No. 18). Alternatively, it seeks summary judgment as to certain claims with respect to liability and/or the availability of statutory damages and attorney fees. *See generally id.* WABI not only opposes TWC's bid for summary judgment, *see generally* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition") (Docket No. 28), but also moves to strike (i) TWC's amended reply to WABI's statement of additional material facts and (ii) an affidavit submitted in support of that amended reply, *see generally* Motion To Strike (Docket No. 45). In its amended reply, TWC revised two paragraphs. *See* Defendant Time Warner Cable LLC's Opposition to Plaintiff's Motion To Strike Amended Reply to Plaintiff's Statement of Additional

1

Facts in Dispute and the Affidavit of Melinda Poore Submitted in Support Thereof (Docket No. 46) & attachment thereto.  Neither revised paragraph is material to, or is taken into consideration in rendering, my recommended decision.  Accordingly, I deem the Motion To Strike moot.  For the reasons that follow, I also recommend that TWC's motion for summary judgment as to all claims against it be granted.[1]

## I.  Summary Judgment Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 2008 WL 2600451, at *2 (1st Cir. July 2, 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has the potential of determining the outcome of the litigation."  *Id.* (quoting *Maymí v. Puerto Rico Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in

---

[1] WABI requested oral argument, which TWC agreed might benefit the court.  *See* Motion for Leave To File Surreply and Request for Oral Argument (Docket No. 38); Defendant Time Warner Cable LLC's Opposition to Plaintiff's Motion for Leave To File Surreply (Docket No. 40) at 2.  While I am usually inclined to grant oral argument when requested, the parties' well-drafted papers fully address the specific basis on which I recommend that TWC's motion for summary judgment be granted.  Therefore, in this instance, the request is denied.

its favor. *Santoni,* 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered

paragraphs" of the nonmovant's statement.   *See* Loc. R. 56(d).   Again, each denial or

qualification must be supported by an appropriate record citation.   *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.   "Facts

contained in a supporting or opposing statement of material facts, if supported by record citations

as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(e).

In addition, "[t]he court may disregard any statement of fact not supported by a specific citation

to record material properly considered on summary judgment" and has "no independent duty to

search or consider any part of the record not specifically referenced in the parties' separate

statement of fact."  *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st

Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule,

noting repeatedly that parties ignore it at their peril and that failure to present a statement of

disputed facts, embroidered with specific citations to the record, justifies the court's deeming the

facts presented in the movant's statement of undisputed facts admitted." (citations and internal

punctuation omitted).

## II.  Factual Background

The parties' statements of material facts, credited to the extent either admitted or

supported by record citations in accordance with Local Rule 56, reveal the following facts

relevant to this recommended decision.[2]

Community Broadcasting Service operates WABI-TV, a CBS-affiliated television station

located in Bangor, Maine.  Defendant Time Warner Cable LLC's Statement of Material Facts in

---

[2] As noted above, Local Rule 56 requires a party responding to a statement of material facts to admit, deny, or
qualify the underlying statement.   *See* Loc. R. 56(c)-(d).   The concept of "qualification" presupposes that the
underlying statement is accurate but in some manner incomplete, perhaps even misleading, in the absence of
additional information.  Except to the extent that a party, in qualifying a statement, has expressly controverted all or
a portion of the underlying statement, I have deemed it admitted.

Support of Its Motion for Summary Judgment ("Defendant's SMF") (Docket No. 19) ¶ 1; Plaintiff's Response to Defendant's Statement of Material Facts and Statement of Additional Facts in Dispute ("Plaintiff's Opposing SMF") (Docket No. 29) ¶ 1.  WABI broadcasts its signal over the air in both analog and digital format.  *Id.* ¶ 2.  Both WABI's over-air analog and digital signals are available free to the public.  *Id.* ¶ 3.  To receive the digital signal, a member of the public needs to have an HDTV set with a digital tuner and an aerial antenna.  *Id.*

The digital signal includes both standard definition digital signals and high definition digital signals.  Statement of Additional Facts in Dispute ("Plaintiff's Additional SMF"), commencing on page 14 of Plaintiff's Opposing SMF, ¶ 12; Defendant Time Warner Cable LLC's Reply to Plaintiff's Statement of Additional Facts in Dispute ("Defendant's Reply SMF") (Docket No. 36), ¶ 12.  The high definition digital signals permit television viewers who have purchased TWC's digital cable service and who own a television that is capable of receiving and displaying high definition signals to view television programming that has been filmed and produced in high definition in a greatly enhanced visual experience.  *Id.*[3]

WABI is the state's oldest television station, having been founded by former Maine Governor Horace A. Hildreth on January 25, 1953.  *Id.* ¶ 1.[4]  WABI was originally a multi-network affiliate of CBS, NBC, ABC, and Dumont networks before becoming a CBS primary affiliate in 1955, and a full-time CBS affiliate in 1959.  *Id.*  It has remained a CBS affiliate ever

---

[3] TWC's objections to this statement on relevance grounds and on the basis of WABI's reliance on the assertedly inadmissible affidavit of Michael Young, Defendant's Reply SMF ¶ 12, are overruled.  Paragraph 16 of the Young Declaration, which WABI cites, is not conclusory; rather, it sets forth concrete facts.  *See* Declaration of Michael Young ("Young Decl."), attached to Plaintiff's Opposing SMF, ¶ 16.  TWC does not suggest that Young, WABI's longtime vice-president and general manager, *see id.* ¶ 2, lacks personal knowledge of the facts recited.  Even if his affidavit happens to be "self-serving" in that it furthers the interests of his employer, that alone does not render it inadmissible on summary judgment.  *See, e.g .*, *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000) ("[A] party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.") (citations and internal quotation marks omitted).

[4] TWC's objection on relevance grounds to paragraphs 1-6 of the Plaintiff's Additional SMF, Defendant's Reply SMF ¶¶ 1-6, is overruled.  While the asserted facts are not outcome-determinative, they provide helpful context.

since.  *Id*.  WABI is now Maine's only locally-owned television station, owned by Diversified Communications of Portland, Maine, which is still controlled by Governor Hildreth's family.  *Id*. ¶ 2.

Local control has facilitated local programming.  *Id*. ¶ 3.  In addition to weeknight local newscasts at 5, 6, and 11, and weekend evening newscasts at 6 and 11, WABI is home to Bangor's only locally-produced morning news program, TV5 Morning News, as well as the area's only locally-produced noon newscast, among other locally-produced programs.  *Id*. WABI's newscasts are regularly the highest-rated local programs in the Bangor viewing area. *Id*.

TWC is a cable system operator doing business in Maine.  Defendant's SMF ¶ 4; Plaintiff's Opposing SMF ¶ 4.  It is part of the company that owns AOL, HBO, Warner Brothers, and a host of other entertainment companies.  Plaintiff's Additional SMF ¶ 4; Defendant's Reply SMF ¶ 4.  It is the second-largest cable provider in the country.  *Id*.  TWC's recent "strategy to expand its cable footprint and improve the clustering of its cable systems" resulted in the acquisition of several competitors, including Adelphia Communications Corporation ("Adelphia"), Comcast, and Pine Tree Cablevision.  *Id*.  TWC now controls 85 percent of Maine's cable market.  *Id*. ¶ 5.  It is the only provider of cable television that carries and delivers digital signals in the geographic area served by WABI.  *Id*. ¶ 6.

In the earliest days of cable television, cable companies took local off-air signals from local broadcasters for free, put them on their cable systems, and charged subscribers a fee for access.  *Id*. ¶ 7.  These local signals included both WABI's locally-produced news and public-

service broadcasts, as well as network and syndicated program.  *Id*.  It costs WABI several million dollars a year to produce and broadcast this programming.  *Id*.[5]

In 1992, Congress passed a statute that allowed local broadcasters to elect to enter into "retransmission consent" agreements with cable companies wishing to carry the local signals of local broadcasters.  *Id*. ¶ 8.  Since that time, WABI has consistently elected and entered into retransmission consent agreements with cable television companies wishing to carry its local signal.  *Id*.  WABI elected and entered into such agreements with TWC's predecessor-in-interest, Adelphia.  *Id*. ¶ 9.

In September 2005, WABI sent its most recent retransmission election letters to cable providers, notifying them of its choice to require retransmission consent agreements with cable providers.  *Id*. ¶ 11.  At that time, Adelphia and Pine Tree were cable providers, but have since been acquired by TWC.  *Id*.[6]

In or about August 2006, TWC acquired Adelphia's assets, including its cable system assets in Maine.  Defendant's SMF ¶ 5; Plaintiff's Opposing SMF ¶ 5.  Prior to TWC's acquisition of Adelphia's cable system in Maine, TWC began negotiations with WABI for the retransmission of WABI's analog signal over TWC's cable system.  *Id*. ¶ 6.  On July 28, 2006, WABI and TWC entered into a retransmission consent agreement for TWC's carriage of WABI's analog signal ("Analog RCA").  Plaintiff's Additional SMF ¶ 14; Defendant's Reply SMF ¶ 14.  The Analog RCA provided that, within six months, the two companies would negotiate in good faith for the carriage of WABI's digital signal.  *Id*. ¶ 15.

---

[5] TWC's objection to paragraphs 7 and 8, on the ground that they state legal conclusions regarding retransmission consent, Defendant's Reply SMF ¶¶ 7-8, is overruled.  I do not construe these paragraphs to do so.  TWC's further objection to these paragraphs on relevance grounds, *id*., is overruled.  While the asserted facts are not outcome-determinative, they provide helpful context.

[6] TWC's objection to paragraph 11 on relevance grounds, Defendant's Reply SMF ¶ 11, is overruled.

On October 18, 2006, Steve Hiltz, director of programming for WABI, wrote a letter to TWC noting that the retransmission consent agreement for the WABI analog local signal required the parties to "enter into good faith discussion and negotiation regarding potential carriage of WABI-TV's digital signal (WABI-DT) on TWC's systems." *Id*. ¶ 17. The parties then engaged in a negotiation lasting almost a year, until TWC broke off negotiations without reaching an agreement in September 2007, after the instant complaint was filed. Plaintiff's Additional SMF ¶ 18; Young Decl. ¶ 22.[7] During the negotiations, numerous written contract drafts were exchanged, and telephone and in-person meetings were conducted, but no agreement was reached. Plaintiff's Additional SMF ¶ 18; Defendant's Reply SMF ¶ 18.

Despite these negotiations, as of January 2007, the parties were nowhere near reaching an agreement. Plaintiff's Additional SMF ¶ 19; Young Decl. ¶ 24.[8] It was important for the parties to reach an agreement before the end of the month because the Super Bowl was scheduled for February 4, 2007, the first weekend in February, and the parties wanted it to be available to TWC subscribers in high definition. Plaintiff's Additional SMF ¶ 20; Defendant's Reply SMF ¶ 20. By January 25, 2007, the TWC engineering department had carved out a channel for the WABI HD signal, along with the HD signal of WGME, another local broadcaster, and was prepared to broadcast the digital signals of both stations. Plaintiff's Additional SMF ¶ 21; Exh. 12 to Declaration of Peter S. Black ("Black Decl."), attached to Plaintiff's Opposing SMF.[9]

---

[7] TWC's objection to this statement as irrelevant, Defendant's Reply SMF ¶ 18, is overruled. TWC alternatively denies that it broke off negotiations, *id.*; however, I view the cognizable evidence in the light most favorable to WABI, as nonmovant.

[8] TWC denies this, Defendant's Reply SMF ¶ 19; however, I view the cognizable evidence in the light most favorable to WABI, as nonmovant.

[9] TWC's objections to this statement on the grounds that it is unsupported by the citation given and is irrelevant, Defendant's Reply SMF ¶ 21, are overruled. TWC alternatively qualifies the statement, admitting that, as of January 25, 2007, it had configured its system in the Waterville area such that WABI's HD signal could be added in the event an agreement was reached between WABI and TWC, but denying that it had assigned WABI's signal a

On or about February 1, 2007, TWC asked for WABI's permission to retransmit WABI's digital high definition signal of the Super Bowl. Plaintiff's Additional SMF ¶ 22; Defendant's Reply SMF ¶ 22. WABI told TWC that it would not allow TWC to broadcast the Super Bowl in high definition without reaching and executing a full agreement, including all terms under which WABI's digital signals would be provided to TWC subscribers. *Id*. ¶ 23. WABI did not want to give up what little bargaining leverage it had. *Id*. Time Warner was and is by far the largest cable company serving WABI's Bangor broadcast market, and there are no other options to have WABI's signal displayed over cable to the homes served by TWC. *Id*. In addition, TWC is the only cable system offering digital television services in the Bangor market. *Id*.[10]

On February 2, 2007, TWC's vice-president of marketing and sales told his marketing department in Portland, Maine, that WABI would not allow the transmission of its HD signal without a signed and executed contract. *Id*. ¶ 24. Despite this, on February 2, 2007, TWC began transmitting the WABI digital signal. Plaintiff's Additional SMF ¶ 25; Young Decl. ¶ 28.[11]

TWC used an HD antenna to capture WABI's digital broadcasts, and then ran the signal through some processing before sending it across its cable network. Plaintiff's Additional SMF ¶ 26; Answers of Defendant Time Warner NY Cable LLC to Plaintiff's First Set of Interrogatories ("Defendant's Interrog. Ans."), Exh. 14 to Black Dec., ¶ 7; Marsh Dep. at 33.

---

channel. *Id*.; Videotape Deposition of Shamrock A. Marsh ("Marsh Dep."), Exh. K to Declaration of Michael J. Sullivan in Support of Defendant Time Warner NY Cable LLC's Motion for Summary Judgment ("Sullivan Decl.") (Docket No. 20), at 54-55.

[10] TWC's objection to the bulk of this paragraph as irrelevant, Defendant's Reply SMF ¶ 23, is overruled.

[11] WABI's statement and TWC's response contain a typographical error, referring to the operative date as February 2, 2008. It is clear from the overall record that the date in question was February 2, 2007. TWC objects to the statement to the extent that it states a legal conclusion that TWC's actions constituted retransmission of WABI's signal under 17 U.S.C. § 111. Defendant's Reply SMF ¶ 25. I overrule the objection, construing the statement as not making such a legal conclusion. TWC additionally qualifies the statement, admitting that on February 2, 2007, it captured WABI's off-air digital signal and placed it on its fiber-optic backbone for the purposes of testing the quality of the signal. *Id*.; Videotape Deposition of Keith Burkley, Exh. H to Sullivan Decl., at 28-29.

The result was that the "content" of the signal went to the homes of TWC subscribers. Plaintiff's Additional SMF ¶ 26; Marsh Dep. at 32.[12] TWC's engineer testified that "[t]here are indeed HD televisions on the market that have MPEG-2 capability" suitable for viewing the WABI digital signal being retransmitted by TWC. Plaintiff's Additional SMF ¶ 27; Defendant's Reply SMF ¶ 27.[13]

To test WABI's digital signal, TWC first needed to capture its off-air digital signal using an antenna. Defendant's SMF ¶ 23; Plaintiff's Opposing SMF ¶ 23. TWC's capture of WABI's off-air digital signal occurred at its Bangor head-end on February 2, 2007. *Id.* ¶ 24.[14] TWC then encoded the signal using an SA-Prisma encoder and transmitted it to its Augusta head-end via an internal fiber-optic cable. *Id.* ¶ 25. The encoded signal was received at TWC's Augusta head-end on February 2, 2007, where it was decoded and combined into a Terayon Groomer, which allowed it to be combined with other signals and assigned a specific frequency. *Id.* ¶ 26. After the signal had been groomed, it was "rate-shaped" into a digital QAM and launched into a Motorola SEM, where the QAM signal was coded with a specific MPEG2 standard. *Id.* ¶ 27. At this point, the signal was on TWC's backbone of fiber-optic cables. *Id.* ¶ 28. Once TWC had captured WABI's digital off-air signal and placed it on its fiber network, it assessed the quality

---

[12] I omit WABI's further statement that "[t]he signal was accessible to any such subscriber with a television with a digital tuner[,]" Plaintiff's Additional SMF ¶ 26, which is neither admitted nor supported by the citations given.

[13] I omit the balance of paragraph 27, sustaining TWC's objection on relevance grounds. Defendant's Reply SMF ¶ 27. WABI relies on a Walmart.com advertisement for the proposition that televisions capable of picking up the WABI digital signal TWC transmitted were available on April 21, 2008, for less than $230. Plaintiff's Additional SMF ¶ 27. It is not clear from the face of the Wal-Mart advertisement that the television to which WABI points was capable of decoding TWC's MPEG transmission. *See* Exh. 3 to Black Decl. In any event, the advertisement reflects a price being charged more than a year after the operative events. *See id.* I also omit paragraph 28, Plaintiff's Additional SMF ¶ 28, sustaining TWC's objection that it is unsupported by the citation given, Defendant's Reply SMF ¶ 28.

[14] A "head-end" is "[a] point in a network at which incoming information is collected or processed for distribution to users." Oxford English Dictionary, *available at* http://www.oed.com.

10

of the signal at its Augusta head-end using a Quam analyzer, in addition to making visual inspections of the actual picture. *Id.* ¶ 32.

Because TWC did not intend to make the signal available to its customers, WABI's digital signal was not assigned a channel through the data access controller and was not encoded with management control. Defendant's SMF ¶ 29; Marsh. Dep. at 30; Declaration of Reggie Clark in Support of Defendant Time Warner NY Cable LLC's Motion for Summary Judgment ("Clark Decl.") (Docket No. 21) ¶ 4.[15] Despite the lack of formatting in WABI's digital signal, it is possible that the signal might have been viewable by a TWC customer with a HDTV with a built-in MPEG tuner, configured to bypass the cable box, who had been manually scanning the channel range, including 733 megahertz. Defendant's SMF ¶ 31; Plaintiff's Opposing SMF ¶ 31.[16]

TWC transmitted WABI's signal from February 2 through February 7, 2007. Plaintiff's Additional SMF ¶ 34; Defendant's Interrog. Ans. ¶ 7.[17] To date, TWC has not produced a single

---

[15] WABI denies this statement on the strength of paragraphs 21, 32, and 33 of its own statement of additional facts. Plaintiff's Opposing SMF ¶ 29. Its attempt at denial falls flat. As discussed below, paragraph 32 and portions of paragraph 33 are non-cognizable; I have sustained TWC's objections to those assertions. *See* nn. 20-21, *infra*. Paragraph 21, and the cognizable portions of paragraph 33, are not inconsistent with, and hence do not controvert, TWC's statement that it did not assign WABI's digital signal "a channel through the data access controller[.]" Defendant's SMF ¶ 29.

[16] I omit paragraph 30, Defendant's SMF ¶ 30, which WABI denies, Plaintiff's Opposing SMF ¶ 30. WABI qualifies paragraph 31, asserting that Nicholas W. Hayden "testified that the signal would also be viewable by a customer with a HDTV that automatically scanned the channels, without a digital box or a converter box. Mr. Hayden further testified that 'auto searches' are available in most high definition televisions sold in the last 10 years." Plaintiff's Opposing SMF ¶ 31. This is not a completely fair characterization of the cited portion of Hayden's deposition. Hayden testified solely as to the manner in which he viewed WABI's digital signal on his television, offering no comment on whether and how it would be viewable to others. *See* Deposition of Nicholas W. Hayden ("Hayden Dep."), Exh. M to Sullivan Decl., at 24-25. Hayden also testified as to the availability of auto-searches in televisions generally, not high-definition televisions specifically. *See id.* at 25.

[17] WABI states that the transmission was made through February 8, 2007. Plaintiff's Additional SMF ¶ 34. However, the record citation it provides for that proposition indicates that the transmission ended on February 7, 2007. Defendant's Interrog. Ans. ¶ 7.

document showing the results from this "test." Plaintiff's Additional SMF ¶ 34; Defendant's Reply SMF ¶ 34.[18]

Two individuals came forward separately and informed WABI that they had seen different WABI programs in digital format (standard and high definition via the TWC cable connection). Plaintiff's Additional SMF ¶ 29; Young Decl. ¶ 29.[19] Nick Hayden reported seeing several programs in February around the time of the Super Bowl on Channel 114.5 of his Sony HDTV. Plaintiff's Additional SMF ¶ 30; Defendant's Reply SMF ¶ 30. John Cushing reported watching programming during the period before, during, and after the Super Bowl on Channel 705, including *CSI*, *Ghost Whisperer*, local news, and the Super Bowl. *Id.* ¶ 31.[20]

TWC has a practice of assigning HD channels in the 700s to coincide with analog channels. Plaintiff's Additional SMF ¶ 33; Marsh Dep. at 41; Deposition of John J. Cushing, III ("Cushing Dep."), Exh. 17 to Black Decl., at 24-26.[21] Because WABI analog is Channel 5, WABI HD would be assigned Channel 705. *Id.* Marsh explained, at his deposition, how TWC selected Channel 705 for WABI's digital signal:

> Q.   What channel had been identified?
>
> A.   Our – the directive that I've had for any programming channelization was handed down to me, and it was based on trying to maintain a commonality between the broadcasters' normal off-air channel and where we put

---

[18] I omit the remainder of paragraph 34, which is neither admitted nor supported by the record citation given. TWC qualifies this statement, admitting that it has not produced any documents relating to its testing of WABI's signal because, as Marsh explained, the testing equipment has a limited amount of memory, and annual calibration of the instruments would have purged their memory. Defendant's Reply SMF ¶ 34; Marsh Dep. at 40, 46.

[19] I omit the second sentence of paragraph 29, sustaining TWC's objection that it is unsupported by a pinpoint citation. Defendant's Reply SMF ¶ 29. TWC denies the first sentence in part, *id.*; however, I view the cognizable evidence in the light most favorable to WABI, as nonmovant.

[20] I omit paragraph 32, Plaintiff's Additional SMF ¶ 32, sustaining TWC's objection that it is unsupported by the citation given, Defendant's Reply SMF ¶ 32.

[21] I omit WABI's further statement that "[t]he assignment of channel 705 to WABI's digital signal is consistent" with the described TWC practice, Plaintiff's Additional SMF ¶ 33, which is neither admitted nor supported by the citations given.

it on the system.  So in this case, Channel [W]ABI being Channel 5, this would
have fallen into our 700 range and would have ended up at 705, if and when it
was built into the data access controller.

Plaintiff's Additional SMF ¶ 33; Defendant's Reply SMF ¶ 33.  Marsh also testified: "When you

groom a channel, it automatically goes into a given frequency . . . .  And a frequency really is a

channel allocation *per se*, but it's not necessarily the channel that you'd utilize for customers."

*Id*.[22]

WABI originally alleged at least 137 separate counts of copyright infringement.

Defendant's SMF ¶ 35; Plaintiff's Opposing SMF ¶ 35.[23]  It has since clarified that its claims for

counts of copyright infringement are limited to retransmissions from February 2 thorugh

February 8, 2007.  *Id*.  According to WABI, each "separate" count may constitute multiple acts

of infringement.  *Id*.  Only two of TWC's customers reported having viewed WABI's digital

signal during the period of TWC's testing.  *Id*. ¶ 39.  One of them, John Cushing, testified that he

first viewed WABI's digital signal when he viewed *Ghost Whisper* in high definition on

February 3, 2007, on a Panasonic TH-50PX50U television set with a built-in cable card, which

enabled him to connect the television directly to his cable without the use of a cable converter

box.  Defendant's SMF ¶ 40; Cushing Dep. at 16-17, 21-22.[24]  Cushing stated that he viewed

WABI's digital signal at Channel 705.  Defendant's SMF ¶ 41; Plaintiff's Opposing SMF ¶ 41.

The last date Cushing viewed WABI's digital signal was either February 6 or 7, 2007.  *Id.* ¶ 42.

---

[22] To the extent TWC objects to paragraph 33 as irrelevant, Defendant's Reply SMF ¶ 33, its objection is overruled.
TWC denies that a channel had been "assigned" – as opposed to "identified" – for WABI's digital signal.  *Id*.;
Marsh Dep. at 41-42.

[23] My recitation incorporates WABI's qualification.

[24] WABI denies this statement on the basis that TWC's paraphrasing of the testimony cited is neither accurate nor
complete.  Plaintiff's Opposing SMF ¶ 40.  I disagree.  The statement is supported by the citation provided and,
hence, is not effectively controverted.

13

Cushing may have viewed the CBS evening news on February 2, 2007 (count 82), and *CSI Miami* the same day. *Id.* ¶ 43.[25]

Nicholas Hayden also viewed WABI's digital signal. *Id.* ¶ 44. The first date that he recalled having viewed the signal was Monday, February 5, 2007. *Id.* Hayden testified that he viewed WABI's digital signal periodically for three or four consecutive days. *Id.* ¶ 45. The last date that he viewed WABI's digital signal was February 8, 2007. *Id.*[26] Hayden testified that he viewed WABI's 5 p.m. and 6 p.m. newscasts on February 5, 2007. *Id.* He further testified that he viewed WABI's digital signal from 5 p.m. until 10 p.m. for three or four consecutive days, beginning on February 5, 2007. *Id.* ¶ 47. Hayden viewed WABI's 5 p.m. and 6 p.m. newscasts (counts 2, 3, 5, 6, 8, 9, 12, and 13), *Everybody Loves Raymond* (counts 100, 107, 113, and 120), and *That 70s Show* (counts 101, 108, 114, and 121) from February 5 through 8, 2007. *Id.* ¶ 48.[27]

Hayden had configured his television such that TWC's coaxial cable was connected directly to the television. *Id.* ¶ 49.[28] Eventually, Hayden could no longer view WABI's digital signal; however, he could not state for certain on which date he discovered that it no longer was available. *Id.* ¶ 50.

### III. Discussion

TWC seeks summary judgment as to all claims against it on several alternate bases: (i) that a violation of the Federal Communications Commission's ("FCC's") retransmission

---

[25] I have omitted TWC's characterization of this as "the most liberal reading" of Cushing's testimony, Defendant's SMF ¶ 43, which WABI denies, Plaintiff's Opposing SMF ¶ 43.

[26] I have omitted TWC's characterization of this as "the most liberal reading" of Hayden's testimony, Defendant's SMF ¶ 45, which WABI denies, Plaintiff's Opposing SMF ¶ 45.

[27] I have omitted TWC's characterization of this as "the most liberal reading" of Hayden's testimony, Defendant's SMF ¶ 48, which WABI denies, Plaintiff's Opposing SMF ¶ 48.

[28] WABI purports to qualify this statement, Plaintiff's Opposing SMF ¶ 49; however, I have sustained TWC's objection to the paragraph of WABI's additional statement of material facts that it cites in support of its qualification.

consent rules, 47 C.F.R. § 76.64, promulgated to effectuate the retransmission consent provisions of 47 U.S.C. § 325(b)(1),[29] does not, as a matter of law, give rise to a copyright infringement action pursuant to 17 U.S.C. § 111, (ii) that TWC did not engage in the secondary transmission of WABI's digital signal "to the public[,]" a predicate for liability pursuant to section 111(c)(2), and (iii) that TWC did not engage in "willful or repeated" secondary transmission to the public, another predicate for liability pursuant to that section.  *See* Defendant's Motion at 8-17; *see also* 17 U.S.C. § 111(c)(2).

As a fallback, TWC seeks summary judgment as to specific claims, arguing that WABI (i) cannot prove copying of the works underlying Counts 19 through 43, (ii) cannot prove infringement of works broadcast before February 2 or after February 8, 2007, a point that WABI declares moot, (iii) cannot sustain its burden of proving ownership of a valid copyright underlying Counts 44-85, 87, 89-94, 97-101, 103-14, 116-21, 123-26, 128-31, and 133-37, and (iv) is not entitled to statutory damages or attorney fees for works that were not timely registered.  *See id.* at 17-23; *see also* Plaintiff's Opposition at 19.

I find dispositive TWC's argument that, assuming *arguendo* the applicability of 17 U.S.C. § 111(c)(2), TWC did not engage in secondary transmission "to the public." Accordingly, I need not and do not address TWC's alternate grounds for summary judgment.

---

[29] Section 325(b)(1) provides that "[n]o cable system or other multichannel video programming distributor shall retransmit the signal of a broadcasting station, or any part thereof," except in three circumstances, one of which is "with the express authority of the originating station[.]"  47 U.S.C. § 325(b)(1).  Pursuant to 47 C.F.R. § 76.64, "[c]ommercial television stations are required to make elections between retransmission consent and must-carry status at three-year intervals."  47 C.F.R. § 76.64(f).  "If a station is a 'must-carry' station, the cable company is required to carry the station's signal."  *Cedar Rapids Television Co. v. MCC Iowa LLC,* 524 F. Supp.2d 1127, 1130 (N.D. Iowa 2007).  "When retransmission consent status is in effect, the cable company cannot carry the local station's signal without the consent of the local station."  *Id.*  "Retransmission consent is typically granted through a retransmission consent contract."  *Id.*

## A.  Secondary Transmission to the Public

Section 111(c)(2) provides, in relevant part:

[T]he willful or repeated secondary transmission to the public by a cable system of a primary transmission made by a broadcast station licensed by the Federal Communications Commission . . . and embodying a performance or display of a work is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506 and 509, in the following cases –

> (A) where the carriage of the signals comprising the secondary transmission is not permissible under the rules, regulations, or authorizations of the Federal Communications Commission[.]

17 U.S.C. § 111(c)(2).  The phrase "to the public" is not defined in section 111.  *See generally id*. § 111.  However, as both parties agree, the Copyright Act elsewhere provides illumination in the form of the following definition:

To perform or display a work "publicly" means –

> **(1)** to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

> **(2)** to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101; *see also* Defendant's Motion at 15; Plaintiff's Opposition at 13.

TWC contends that (i) WABI's evidence that two viewers came forward to report having viewed WABI's digital signal on cable does not suffice to show that a substantial number of people viewed the alleged retransmission, and (ii) the restrictions placed on TWC's testing of WABI's signal favor a finding that there was no retransmission to the public, distinguishing this case from situations in which an insubstantial number of people actually view a performance despite the potential for much broader dissemination.  *See* Defendant's Motion at 15-16 (citing,

*inter alia*, *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 942 F. Supp. 1265, 1270-71 (C.D. Cal. 1996), *rev'd in part on other grounds*, 149 F.3d 987 (9th Cir. 1998); 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 8.14[C] (2008)).

WABI counters that (i) the law is clear that a plaintiff need not prove actual viewing by the public, so long as a broadcast was capable of being viewed, and (ii) TWC admits that its own engineers and its own customers actually did view WABI's programs in high definition and that the signal was transmitted to the homes of all TWC subscribers connected to the TWC cable network and was viewable on any television with a digital tuner.  *See* Plaintiff's Opposition at 13.  WABI contends that, unlike in *Los Angeles News Service*, in which the court held that the plaintiff had failed to show a transmission was a "public performance" because it had "no evidence on which to find that a substantial number of people *could have seen* the copyrighted footage[,]" in this case, "WABI has shown and TWC has conceded that a substantial number of people – indeed, anyone with a television and a digital tuner – *could have seen* the copyrighted programs."  *Id*. at 16 (quoting *Los Angeles News Service*, 942 F. Supp. at 1270) (emphasis added by WABI).

TWC replies that WABI has neither shown, nor has TWC conceded, that a substantial number of people could have viewed WABI's digital signal during the limited period during which it was tested by TWC.  *See* Defendant Time Warner Cable LLC's Reply Memorandum ("Defendant's Reply") (Docket No. 35) at 7.  In TWC's view, WABI is mistaken to suggest that any TWC customer with a television and a digital tuner could have seen WABI's digital signal. *See id*.  To the contrary, TWC argues, relatively few people were likely to have satisfied all conditions necessary to have been able to view WABI's digital signal during TWC's transmission, including (i) configuration of their television sets such that the coaxial cable was

17

connected directly to the set, bypassing the converter box, (ii) possession of a television equipped with a MPEG tuner, not simply a digital tuner as WABI asserts, and (iii) a chance encounter with the transmission upon manually scanning the channels, no channel having ever been "assigned" by TWC.  *See id.* at 7-8.

In a final rejoinder, WABI protests that TWC's arguments merely underscore that a jury issue exists as to whether TWC retransmitted its signal to the public.  *See* Plaintiff's Surreply to Defendant's Reply Memorandum ("Plaintiff's Surreply") (Docket No. 47) at 4.  WABI dismisses TWC's assertions that the potential number of viewers was small, and that WABI is mistaken regarding whether any TWC customer with a television and a digital tuner could have seen WABI's digital signal, as "attorney arguments asking the court to draw inferences favorable to TWC, which is impermissible on summary judgment."  Plaintiff's Surreply to Defendant's Reply Memorandum ("Plaintiff's Surreply") (Docket No. 47) at 4.  WABI points out that "[t]here is no affidavit or testimony that a 'digital tuner' differs in any way from an 'MPEG' tuner."  *Id.* (footnote omitted).  It represents that digital and MPEG tuners "are indeed the same."  *Id.* n.4 (citing definition of "MPEG" in Wikipedia, http://en.wikipedia.org/wiki/MPEG).  Finally, it argues that TWC's assertion that "no channel was ever assigned" is contradicted, *inter alia*, by the testimony of TWC's own engineer that channels automatically are assigned when a signal is "groomed" as well as by the testimony of Cushing that he saw the programming on Channel 705.  *See id.* at 4.

### B.  WABI's Showing

WABI is correct that, for purposes of demonstrating transmission "to the public," it need not prove that a substantial number of people actually viewed the challenged transmission.  *See, e.g.*, H.R. Rep. No. 94-1476 (1976), at 64-65, *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5678

("[A] performance made available by transmission to the public at large is 'public' even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of transmission."); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp.2d 737, 755 (D. Md. 2003) ("The hundreds of Legg Mason brokers to whom the 'morning call' was broadcast represent a limited, but sufficient segment of the public.  The performance, moreover, loses nothing of its 'public' nature if fewer than all the potential recipients actually tuned in or listened."); 2 *Nimmer* § 8.14[C][2] ("Suppose there is no proof that a substantial number, or indeed, that any persons were in fact operating their respective receiving apparatus' at the time of transmission of a given work.  Does such transmission nevertheless constitute a *public* performance?  The House Report [H.R. Rep. No. 94-1476 (1976)] states that it does, and that no such proof is necessary.  This confirms that a 'public' performance merely requires that such performance be 'open' to, that is, available to, a substantial number of persons.  It is not necessary that they in fact attend or receive the performance.") (footnotes omitted) (emphasis in original).

Nonetheless, WABI is not relieved of its burden to make a showing regarding the "public" nature of TWC's transmission.  Rather, it must prove that, despite restrictions imposed by TWC on viewership, the challenged transmission was capable of being viewed by a substantial number of people.  *See, e.g.*, *Los Angeles News Service*, 942 F. Supp. at 1270 ("LA News has not submitted evidence about the location of the video monitor on which the Union receives fiber link transmissions, so it cannot show that the performance was public.  If the monitor is located in a small engineering room or intake room, only one or two people – an insubstantial number – could view it.  If it is in a large room where many people work, any number of Union's employees, who would not represent a normal circle of a family, could have

received and seen the transmission.  Because LA News has not explained where the Union's monitor is located, the Court has no evidence on which to find that a substantial number of people could have seen the copyrighted footage."); 2 *Nimmer* § 8.14[C][2] ("On the other hand, if a transmission is only available to one person, then it clearly fails to qualify as 'public.'  For it neither directly reaches 'a substantial number of persons' nor is it transmitted to a place where such a grouping is congregated.  As such, it does not implicate the copyright owner's rights.") (footnotes omitted).

"Where, as here, the nonmovant-plaintiff has the burden of proof, the evidence adduced on each of the elements of his asserted cause of action must be significantly probative in order to forestall summary judgment."  *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 30 (1st Cir. 2007). "[S]ummary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation."  *Mariasch v. Gillette Co.*, 521 F.3d 68, 71 (1st Cir. 2008) (citation and internal quotation marks omitted).  Even viewing the cognizable evidence in the light most favorable to WABI, I am not persuaded that WABI makes a sufficient showing to avert summary judgment.

TWC makes no admission that WABI's digital signal was viewable either by a substantial number of persons or by any TWC customer with a television set with a digital tuner. To the contrary, it adduces evidence that is either uncontradicted, or not successfully controverted, that:

1.      The programming at issue was transmitted in digital format.  *See* Defendant's SMF ¶ 23; Plaintiff's Opposing SMF ¶ 23.

2.      Such programming is not viewable unless a customer possesses a television set capable of receiving digital signals.  *See id.* ¶ 3.  Therefore, customers who had only analog-compatible television sets could not have viewed the challenged transmission.

3.      The challenged transmission was viewable only on televisions with tuners capable of decoding MPEG-2 signals.  *See id.* ¶ 31.  WABI points out that the record is devoid of any affidavit or testimony indicating whether MPEG tuners are the same thing as digital tuners.  *See* Plaintiff's Surreply at 4.  However, the omission cuts against, rather than aiding, WABI.  Seemingly so recognizing, WABI asserts, in a footnote, that there is in fact no difference between MPEG and digital tuners.  *See id.* at 4 n.4.  However, its belatedly proffered evidence, contained only in a surreply brief, is not presented in accordance with Local Rule 56 and, hence, is non-cognizable.  *See, e.g., Shaw v. M.S.A.D. # 61*, No. Civ. 00-217-P-C, 2001 WL 55404, at * 1 n.1 (D. Me. Jan. 22, 2001) (rec. dec., *aff'd* Mar. 8, 2001) ("The strewing of responses to facts throughout the body of a brief contravenes not only the letter but also the spirit of the rule, key purposes of which are to focus the issues and to conserve the time of counsel and the court.").

Moreover, even assuming *arguendo* that any television set with a digital tuner could have decoded the challenged transmission, the record is bereft of any indication as to how many TWC customers in the relevant viewing area had such television sets.  WABI endeavored to make a showing on that point, citing a Walmart.com advertisement for the proposition that televisions capable of picking up the WABI digital signal that TWC transmitted were available on April 21, 2008, for less than $230.  *See* Plaintiff's Additional SMF ¶ 27; Exh. 3 to Black Decl.  However, I sustained TWC's objection on relevance grounds to that assertion, noting that it was not clear from the face of the Wal-Mart advertisement that the television in question was capable of decoding TWC's transmission and that, in any event, the advertisement reflected a price charged

more than a year after the operative events.  *See* Exh. 3 to Black Decl.  This failure of proof is hardly insignificant: in the absence of any indication of how many TWC customers possessed television sets capable of decoding the challenged transmission, it simply is not possible to divine the number of viewers who potentially could have met the remaining conditions to viewership of the transmission in question.

4.      The challenged transmission was viewable only by TWC customers who had connected their coaxial cables directly to their television sets, bypassing converter boxes, as had Hayden and Cushing.  *See* Defendant's SMF ¶ 31; Plaintiff's Opposing SMF ¶ 31; *see also id.* ¶ 49; Defendant's SMF ¶ 40; Cushing Dep. at 16-17, 21-22.  WABI offers no evidence, apart from that concerning Hayden and Cushing, from which one might extrapolate the number of TWC customers who met this additional, seemingly significant, condition to viewership of the challenged transmission.[30]

5.      The challenged transmission was viewable only by TWC customers who happened to have been scanning channels manually or via auto-search and chanced upon it, as Hayden testified that he did.  *See* Defendant's SMF ¶ 31; Plaintiff's Opposing SMF ¶ 31.  While TWC did not officially assign the signal a channel "through the data access controller[,]" Defendant's SMF ¶ 29; Marsh. Dep. at 30; Clark Decl. ¶ 4, the transmission was made over a channel or channels, with Hayden having watched it on Channel 705 and Cushing having viewed it on Channel 114.5, *see* Plaintiff's Additional SMF ¶¶ 30-31, 33; Defendant's Reply SMF ¶¶ 30-31, 33.  Yet, there is no evidence that any TWC customer was invited to view WABI's digital channel on TWC cable or that TWC otherwise advertised or promoted its availability.

---

[30]  While WABI could not realistically have shown how many TWC customers with digital service and converter boxes chose to bypass those boxes, it presumably could have shown how many TWC customers with digital service did not have converter boxes, from which the requisite bypass might be inferred.

6.     The challenged transmission was made, at most, for a period of approximately one week, commencing on February 2, 2007, and ending by February 8, 2007. *See* Defendant's SMF ¶ 35; Plaintiff's Opposing SMF ¶ 35. Thus, it was viewable by TWC customers, meeting all of the above criteria, only during that period.

WABI, for its part, places little cognizable evidence on the opposite side of the scale. Its case, rather than being distinguishable from that of the plaintiff in *Los Angeles News Service*, parallels it. WABI asks a trier of fact to infer that, because its digital signal was viewable under a certain set of circumstances, and two TWC customers reported actually having viewed it, a substantial number could have viewed it. Yet, on the record presented, this is not a "reasonable inference" of the sort that must be drawn on summary judgment in a nonmovant's favor. *See Santoni*, 369 F.3d at 598. A trier of fact would have no basis, other than uninformed speculation, on which to conclude that the challenged transmission was viewable by a substantial number of people who could satisfy all of the above-enumerated conditions. This is not the sort of significantly probative showing as to an essential element of a nonmovant's case that suffices to avert summary judgment.

### IV.  Conclusion

For the foregoing reasons, I deem WABI's motion to strike moot and recommend that the court grant TWC's motion for summary judgment as to all claims against it.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum,*

*within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

Dated this 7th day of August, 2008.

<u>/s/  John H. Rich III</u>
John H. Rich III
United States Magistrate Judge